Ahren A. Tiller, Esq. [SBN: 250608]
Brett F. Bodie, Esq. [SBN: 264452]
Bankruptcy Law Center, APC
1230 Columbia St., Ste 1100
San Diego, CA 92101
Ph: (800) 492-4033
Fax: (866) 444-7026

Attorneys for Debtor
KAREN MARLENE HASAN

## UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>KAREN MARLENE HASAN<br><br>     Debtor,<br><br>KAREN MARLENE HASAN<br><br>     Movant,<br><br>vs.<br><br>DEPARTMENT OF VETERANS AFFAIRS<br><br>     Respondent, | CASE NO.: 13-03632-LA7<br><br>**MOTION FOR ORDER TO SHOW CAUSE WHY DEPARTMENT OF VETERANS AFFAIRS SHOULD NOT BE FOUND IN CONTEMPT AND SANCTIONED FOR WILLFUL VIOLATIONS OF THE AUTOMATIC STAY AND DISCHARGE INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>[Notice of Motion, Declaration of Karen Hasan, Declaration of Attorney Ahren A. Tiller, and Exhibits A - J filed concurrently]<br><br>Date:  April 23, 2015<br>Time:  2:00pm<br>Dept:  2, Room 118<br><br>Honorable Louise DeCarl Adler |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ……………………………………………………...…….…..1

II.   STATEMENT OF FACTS........................................................................................1

III.   LEGAL ANALYSIS …. ...............................................................................11

    A.   JURISDICTION AND VENUE …………….....................................11

    B.   THE RESPONDENT WILLFULLY VIOLATED BOTH THE AUTOMATIC STAY AND LATER THE DISCHARGE INJUNCTION PURSUANT TO 11 U.S.C. §362 AND 11 U.S.C. §524 …………………………………………….......14

    C.   THE BENEFIT OVERPAYMENT THAT OCCURRED IN 2008 IS NOT A POST-PETITION "DEBT" SIMPLY BY VIRTUE OF THE RESPONDENT "ESTABLISHING" THE OVERPAYMENT POST-PETITION…...………….14

    D.   THE RESPONDENT'S ACTIONS WERE NOT "RECOUPMENT" AND ARE NOT EXEMPT FROM THE AUTOMATIC STAY OR DISCHARGE INJUNCTION...……………………………………………….……16

IV.   CIVIL CONTEMPT REMEDIES….………………………………………………17

V.   DAMAGES……………………………………………………………………18

VI.   CONCLUSION …………………………………………………….................21

1

### TABLE OF AUTHORITIES

2

**Cases**                                                                                          **Page(s)**

3 *In re A.H. Robins Company Inc.,* 63 Bankr. 986 (Bankr. E.D. Va 1986) ………………………15

4 *In re Baldwin-Untied Corp.,* 48 Bankr 901 (Bankr. S.D. Ohio 1985) …………………………..14

5 *Behrens v. Woodhaven Asso.,* 87 B.R. 971, (N.D. Ill. 1988) …………………………………….14

6 *Computer Communications Inc. V. Codex Corp.,* 824 F.2d 725 at 731 (9th Cir. 1987) ………..17

7 *Crystal Palace Gambling Hall Inc. V. Mark Twain Industries, Inc*. 817 F.2d 1361 at 1366 (9th

8 Cir. 1987) ………………………………………………………………………………………..17

9 *Flagstaff Realty Asoocss.,* 60 F.3d 1031 (3rd Cir. 1995) …………………………………………...16

10 *Giardina v. Parnell (In re Giardina),* 2004 Bankr. LEXIS 2464, 7 (Bankr. E.D. La. Aug 31,

11 2004 ……………………………………………………………………………………………...15

12 *In re Granados*, 503 B.R 726 at 733 (9th Cir. BAP, 2013) …………………………………...12

13 *Hardy by & Through IRS v. United States (In re Hardy),* 97 F.3d 1384, 1390, 1996 U.S. App.

14 LEXIS 27417 ……………………………………………………………………………………13

15 *Havelock v. Taxel*, 67 F.3d 187 at 191 (9th Cir. 1995) ………………………………………….17

16 *In re Hawley*, 03.2 I.B.C.R. 108, 111, 2003 Bankr. LEXIS 448, 2003 WL 21105074 …………12

17 *Herbert v. United States (In re Herbert)*, 81 A.F.T.R.2d (RIA) 2105 (B.A.P. 9th Cir. 1998) ….18

18 *Hessinger & Assocs. v. U.S. Tr. (In re Biggar)*, 110 F.3d 685, 687 (9th Cir. 1997) …………….12

19 *In re Howell*, 4 B.R. 102 (M.D. Tenn, 1980) …………………………………………………….17

20 *Kelly v. Robinson,* 479 U.S. 36 at 50, n, 12 93 L. Ed. 2d 216, 107 S. Ct. 353 (1986) …………..14

21 *Knupfer v. Lindblade* (In re Dyer), 322 F.3d 1178, 1191 (9th Cir. 2003) …………………...12, 18

22 *Lee v. Schweiker¸* 739 F.2d 870 (3rd Cir. 1984) …………………………………………………17

23 *Lugo v. Paulsen,* 886 F.2d 602 at 608, 1989 U.S. App. LEXIS 14401 citing H.R. Rep.

24 No. 595, 95th Cong. 1st Sess. 309 (1977) ……………………………………………………...14

25 *In re Neal*, 106 B.R. 90, (Bankr. E.D.N.C. 1989) ……………………………………………….18

26 *In re Novak*, 223 B.R. 363 at 366-367 (Bankr. M.D. Fla. 1997) ………………………………...17

27 *Perry v. U.S. Bank Nat'l Ass'n*, 03.2 I.B.C.R. 128, 129-30 (Bankr. D. Idaho 2003) ………...12, 13

28 *In re Remington Rand Corp.,* 836 F.2d 825 at 829 (3d. Cir. 1988) ……………………………..14

*Renwick v. Bennett (In re Bennett)*, 298 F.3d 1059, 1069 (9th Cir. 2002) ………………….12, 13

S Rep. No. 989, 95th Cong. 2d Sess. 21 (1978) …………………………………………………14

*State Bd. of Equalization v. Taxel,* 98 F.3d 1147, at 1152 (9th Cir. 1996) ……………………..17

*United Structures of Amer. v. G.R.G. Eng'g*, 9 F.3d 996 at 999 (1st Cir. 1993) ……………...16

*In re University Medical Ctr.,* 973 F.2d 1065 (3rd Cir. 1992) …………………………………...16

*In re Zartun*, 30 B.R. 543 at 546 (B.A.P. 9th Cir. 1983) …………………………………………17

*ZiLOG, Inc. v. Corning (In re ZiLOG, Inc.)*, 450 F.3d 996, 1007 (9th Cir. 2006) ……………...12

**Statutes**

11 USC §101 ………………………………………………………………………………………14

11 USC §105 ………………………………………………………………………...11, 12, 17, 21

11 USC §157 ………………………………………………………………………………………11

11 USC §301 ………………………………………………………………………………………11

11 USC §362 ……………………………………………………………………1, 11, 12, 17, 18, 21

11 USC §523 ………………………………………………………………………………………12

11 USC §524 ……………………………………………………………………...1, 11, 12, 17, 21

11 USC §542 ………………………………………………………………………………………12

11 USC §727 ………………………………………………………………………………………12

# I. INTRODUCTION

KAREN MARLENE HASAN, (hereinafter referred to as "Debtor" or "Ms. Hasan") by and through her counsel of record, Ahren A. Tiller, hereby moves this Court for an order to show cause why the Department of Veterans Affairs (hereinafter referred to as "Respondent" or "VA") should not be held in contempt and sanctioned for willful violations of the automatic stay and discharge injunction, and ordered to pay an award of damages and sanctions consisting of injunctive relief, monetary relief, punitive damages, and attorney's fees and costs pursuant to 11 U.S.C §362, §524, and §105. This Motion is based on good cause, the Memorandum of Points and Authorities in support thereof, and Declarations of the Debtor and her Counsel filed herewith.

# II.  STATEMENT OF FACTS

In 1972, Ms. Hasan enlisted in the United States Air Force and was honorably discharged approximately one year later.  In 1980, Ms. Hasan enlisted in the United States Army and served approximately three years.  She received an honorable discharge from the Army as well.  Ms. Hasan's military service entitled her to the possibility of VA Pension benefits.

In the early 2000s, Ms. Hasan was diagnosed with a psychiatric condition.  Her medical condition eventually led to a disability.  Based upon Debtor's medical disability, she became entitled to receive VA Pension benefits.  Ms. Hasan started receiving her VA pension benefits in 2003.

In March of 2005, the VA Pension Management Center notified Ms. Hasan that upon reviewing her income, she had apparently earned excess income during corresponding periods in which she received her pension benefits.  Ms. Hasan was informed that based upon said income, she was ineligible to receive her VA pension.  Consequently, the VA inadvertently overpaid Ms. Hasan approximately $32,093.00.

Thereafter, Ms. Hasan entered a voluntary repayment plan with the Department of Veterans Affairs.  Over a period of time, Ms. Hasan diligently remitted approximately $6,000.00 towards her outstanding overpayment obligation.

In 2008, Ms. Hasan was genuinely unable to remain current on her voluntary payment plan with the VA, and she ceased making payments.

On December 27, 2012, Ms. Hasan met with attorney Ahren Tiller, and retained his law firm, Bankruptcy Law Center, APC to represent her in a bankruptcy case.

On April 9, 2013, Ms. Hasan filed a Chapter 7 Bankruptcy Petition in the Southern District of California, case number 13-03632-LA. Ms. Hasan scheduled the VA benefit overpayment claim on Schedule F, and included multiple addresses for the Department of Veterans Affairs. The Court Certificate of Mailing with Service by BNC shows the following addresses listed for the VA's claim:

*Via First Class US Mail:*

> Department of Veterans Affairs
> P.O. Box 530269
> Atlanta, GA 30353-0269

> Department of Veterans Affairs
> 110 9th Ave. South
> Nashville, TN, 37203-3867

> US Dept. of Veterans Affairs
> Western Area Office
> 3333 N. Central Ave. #3026
> Phoenix, AZ 85012-2458

> Veterans Benefits Admin.
> 810 Vermont Ave NW
> Washington, DC 20420-0001

*and Via Electronic Notice:*

> EDI – DFAS.com DFAS DE/FYDC (8899 East 56th St Indianapolis, IN 46249-33300)
> EDI – DFAS.com Defense Finance and Accounting (1240 E. 9th Street Cleveland, OH 44199-2055)

A true and correct copy of the Court Certificate of Mailing with Service by BNC is attached hereto as Exhibit A and incorporated by this reference. The Court granted a Discharge of the Debtor on July 11, 2013, and Ms. Hasan's bankruptcy case was closed on July 15, 2013.

On February 24, 2014, Ms. Hasan filed her tax returns for tax years 2011 and 2013. Debtor's tax returns showed refunds owed to her of $2,019.00 for 2011 and $2,399.00 for 2013.

On March 10, 2014, Ms. Hasan filed her tax return for tax year 2012. Her 2012 tax return showed a refund owed to her of $2,305.00.

Upon filing her tax returns, Ms. Hasan received notification from the IRS that the tax refunds owed to her were seized and paid to the U.S. Department of the Treasury for the outstanding debt she owed to the Department of Veterans Affairs. A true and correct copy of the notices sent by the IRS and Tax Transcripts for Tax Years 2011, 2012, and 2013 are attached hereto as Exhibit B and incorporated by this reference.

On March 3, 2014, Ms. Hasan contacted her bankruptcy attorney's office and spoke with attorney Ahren Tiller regarding the seized tax refunds. She was noticeably overwhelmed and frustrated. Mr. Tiller advised Ms. Hasan that the seizure was unlawful as it violated the Discharge Order in her bankruptcy case. Mr. Tiller explained to her that he would contact the Department of Veterans Affairs, and that he believed the issue could be informally resolved.

Between March 3rd, 2014 and March 6th, 2014, Mr. Tiller placed two outbound calls to the Department of Veterans Affairs. After extended holds and multiple transfers Mr. Tiller was able to speak extensively about this situation with an agent named Scott at the VA. They discussed the issue at length and after Mr. Tiller thoroughly explained that the seizure of Debtor's refund was a violation of the discharge, Scott ensured that the situation would be rectified and requested that following their conversation Mr. Tiller e-mail him copies of the Debtor's bankruptcy paperwork.

On March 6, 2014, Mr. Tiller sent a detailed e-mail to Scott at "DMC.OPS@va.gov", outlining why the VA's actions were unlawful. Attached to Mr. Tiller's e-mail were the following: (1) the Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors & Deadlines; (2) the Debtor's Discharge Order; and, (3) a copy of the Debtor's bankruptcy Schedules and Forms. A true and correct copy of the e-mail and attachments are attached hereto as Exhibit C and incorporated by this reference. Later that very same day, Mr. Tiller exchanged e-mails with Ms. Hasan. He provided her a copy of the e-mail he sent to the VA, and explained to her that he believed the situation would be resolved. Mr. Tiller instructed Ms. Hasan to contact the VA in order to follow up and have her tax refund returned to her.

On March 18, 2014, Ms. Hasan again reached out to Mr. Tiller because she had not received her tax refunds, or any notice from the VA regarding returning the seized funds. Mr. Tiller stated he would contact the VA, but also requested Debtor do the same, in a joint attempt to procure any information concerning the status of Ms. Hasan's refund. Mr. Tiller placed an outbound call to the VA and was again placed on an extended hold. After 60 minutes had already passed, while he was still on hold, Mr. Tiller received an e-mail from the Debtor stating that she had been able to speak to a VA representative. The representative informed the Debtor that her account showed in their system as being, "in bankruptcy." The representative also stated that he could see Mr. Tiller's March 6, 2014 e-mail, and said that it was sent to their "back office bankruptcy department." The VA representative then advised Ms. Hasan that the VA would in fact be refunding her tax refunds, and instructed her to check back after March 28, 2014.

Around that same time, Debtor asked Mr. Tiller about payment for his work in recovering her tax refund. Mr. Tiller responded that his primary concern was to do what was in her best interest, and Mr. Tiller explained that seeking sanctions against the VA in order to seek attorney's fees would most likely only serve to delay the receipt of her refund. He advised her that if they were forced to initiate a formal motion for contempt and sanctions, then he could recover fees, but at this time it was in her best interest to get the tax refund returned as quickly as possible without filing formal pleadings. A true and correct copy of this e-mail exchange is attached hereto as Exhibit D and incorporated by this reference.

On April 3rd, 2014, despite their multiple assurances, instead of immediately returning the unlawfully-seized tax refunds to Ms. Hasan, the VA *sent another collection letter* to Debtor. A true and correct copy of the April 3, 2014 collection letter is attached hereto as Exhibit E and incorporated by this reference.

On April 11, Ms. Hasan again contacted Mr. Tiller's office and expressed concern that she had not yet received her tax refunds. Mr. Tiller advised Ms. Hasan that he would send a formal letter to the VA. This letter would again notify the VA that their conduct was unlawful, demand that they immediately cease their offending conduct, and return her refunds. He

explained to Ms. Hasan that if he could get the VA to informally return her money, she would receive it more quickly than if he had to file a formal motion for sanctions with the Bankruptcy Court. Debtor's Counsel instructed Ms. Hasan to let him know if she did not timely receive her refunds from the VA.

On April 21, 2014, Mr. Tiller prepared and sent a formal letter to the VA. In the letter to the VA, Debtor's Counsel again outlined that their seizure of Ms. Hasan's tax refunds was unlawful, and that they must immediately return the funds to her. Mr. Tiller advised that if the VA did not comply with this request then he would be forced to file a motion with the Bankruptcy Court and request that the VA be found in contempt, and sanctioned. A true and correct copy of the letter is attached hereto as Exhibit F and incorporated by this reference.

Thereafter, in early May of 2014, Debtor received approximately $2,303.00 of the total funds being held by the VA. This partial refund purportedly reflected Debtor's $2,305.00 refund for the corresponding 2012 tax year. Ms. Hasan was confused why the amount did not match the amount that the IRS stated was withheld, and to date Ms. Hasan and her Counsel are perplexed why the VA chose to only refund one of the three tax refunds it had unlawfully seized. Ms. Hasan hoped and believed that the Department of Veterans Affairs was processing the return of her residual funds, however despite the repeated contacts from Ms. Hasan and her Counsel, the VA has never returned the residue of her wrongfully seized tax refunds.

On June 12, 2014, Ms. Hasan again followed up with her Counsel, Mr. Tiller. She let his office know that she had still not received the balance of her tax refunds. Debtor's Counsel was on vacation for two weeks in June, and in his absence a member of his staff advised Ms. Hasan that a review of her file indicated that Mr. Tiller had previously spoken with the VA in addition to sending formal correspondence. Ms. Hasan was advised that Mr. Tiller would review the issue again when he returned from vacation.

On June 24, 2014, upon returning to the office, Mr. Tiller again contacted the VA via an outbound telephone call. He was again placed on an extended hold. Mr. Tiller eventually spoke with a VA representative, who provided no useful information, other than the refunds were still being processed. Mr. Tiller explained to Debtor that he believed the refunds would be issued; it

just may take a little more time.  He advised her to follow up with him again if she still did not receive the refunds.

On July 14, 2014, Ms. Hasan had still not received her funds so she telephoned her attorney again to check on the status of the return of her unlawfully seized tax refunds.   Mr. Tiller understood that the Debtor was distraught over not receiving these funds and advised the Debtor that he had been assured the VA was processing the return of her funds and that he believed she would receive the funds shortly.  Debtor's Counsel advised Ms. Hasan to give it a few more weeks and let him know if she did not receive her refunds.

Although $4,420.00 to some individuals is not a significant amount of money, to Ms. Hasan, this unlawful seizure by the VA devastated her financially, because she truly needed these funds to pay for her most basic needs.  Ms. Hasan makes $17 per hour, thus the loss of her tax refunds and the threat of further collection actions caused her to become distraught.   During this period, the Debtor suffered significant stress and anxiety over the unlawful actions committed by the VA.  Ms. Hasan began to believe that she would never receive her funds, and felt overwhelmed as she had outstanding bills she need to pay and none of her Counsel's actions were resolving the situation.

On August 10, 2014, Ms. Hasan experienced severe chest pains and was concerned she was having a heart attack.  She was rushed to the emergency room, seeking medical treatment. Following an examination and tests, the treating physician informed Ms. Hasan that he believed her acute chest pains were a result of stress and anxiety, which were exacerbating her existing heart disease.  The physician recommended Ms. Hasan take steps to reduce her stress and anxiety.  A true and correct copy of a Summary of Payments for the Aug 10, 2014 medical services is attached hereto as Exhibit G and incorporated by this reference.

At the time, the most significant source of stress, anxiety, and frustration, was Ms. Hasan's futile battle with the VA.  In order to preserve her health and reduce her stress caused by this situation, Ms. Hasan decided to temporarily abandon the issue of the unlawfully-seized $4,420.00.  For just over a month, Ms. Hasan did her best not to think about or address the missing money.

1    Astonishingly, in early September of 2014, the VA after reviewing Debtor's Counsel's

2    letters, e-mails, and multiple phone calls determined that upon further review of their records,

3    Ms. Hasan owed the VA an additional $14,060.00 for an overpayment of VA benefits she

4    received in 2008.  The VA not only stated in their letter they would not be returning her seized

5    refunds, yet the VA intended to collect from Ms. Hasan the additional $14,060.00 for the 2008

6    overpayment.

7    In October of 2014, Ms. Hasan received another collection letter from the VA.  The

8    letter informed her of the benefit overpayment and alleged that she owed an even larger balance

9    of $14,060.00.  The VA stated that they were applying all of her seized tax refunds to this

10    additional debt and would be collecting on the remaining balanced still owed.  Ms. Hasan was

11    understandably confused by the VA's letter.  She initially incorrectly assumed that the alleged

12    debt was for a wrongful charge of post-bankruptcy medical treatment by the VA.  Because Ms.

13    Hasan did not initially believe this newly alleged debt was a result of a pre-petition

14    overpayment, instead of contacting her bankruptcy attorney, she contacted the office of

15    Congresswoman Susan A. Davis, a Member of the U.S. House of Representatives.

16    The Debtor spoke with Lee Steuer, the Senior Community Representative for

17    Congresswoman Davis.  While reviewing the issue with Ms. Steuer, it became clear to Ms.

18    Hasan and Ms. Steuer that the "new" debt to the VA was not a wrongful debt from treatment at

19    a VA facility, but in fact another benefit overpayment dating back to 2008.  Ms. Steuer then

20    assisted Ms. Hasan in attempting to resolve the matter with the VA.

21    In mid-October of 2014, Congresswoman Davis sent a formal letter to the VA.

22    Congresswoman Davis requested an explanation and release of Ms. Hasan's tax refunds still

23    being held by the VA.

24    On November 3, 2014, the acting director of the VA responded to Congresswoman

25    Davis via a letter dated that same date.  In their response, the VA stated that they were fully

26    aware of Ms. Hasan's bankruptcy case, and that the VA's position was that even though the

27    alleged benefit overpayment occurred in 2008 (five years prior to the Debtor's bankruptcy

28    filing), that because the VA did not "establish" the debt until September 2014, it was a post-

petition claim that was not discharged in Ms. Hasan's bankruptcy case. Therefore, the VA took the position that they were rightfully withholding Ms. Hasan's tax refunds. Remarkably, this November 3rd, 2014 letter was not sent by a low level representative of the VA, yet the letter was actually signed by "Jamie Jones, for Vikki L. Soukuo, Acting Director" of the Veterans Administration. A true and correct copy of the response letter sent by the VA is attached hereto as Exhibit H and incorporated by this reference. After receiving the troubling response from the VA, Ms. Steuer at Congresswoman Davis' office advised Ms. Hasan that she could do nothing further and instructed her to follow up with her bankruptcy attorney to see if he could assist her in resolving the matter.

On November 14, 2014, Ms. Hasan received yet another collection letter from the VA. This letter stated that Ms. Hasan owed $14,060.00, and that the VA were reporting this delinquent balance to her credit report and were referring her account to the Department of Treasury for collection. The VA also stated they would pursue collection efforts with private debt collectors, and even went so far as to threaten garnishing Ms. Hasan's wages. A true and correct copy of the November 14, 2014 collection letter sent by the VA is attached hereto as Exhibit I and incorporated by this reference.

Furthermore, around that same time, Ms. Hasan began to receive collection calls from the Veteran's Administration. They threatened not only to garnish her wages, they explained to her that she would be ineligible for a VA loan or to receive any other type of Federal Veteran program benefits again. The November 14, 2014 letter and resulting phone calls pushed Ms. Hasan into a severe depression as she genuinely felt that she could never escape the VA debt. She knew that if her wages were garnished, she would not be able to pay rent, and would certainly be evicted from her home. This fear caused Ms. Hasan significant stress and anxiety. She felt hopeless as she had already pursued this issue with her Bankruptcy Counsel, who spoke with multiple VA representatives and sent e-mails and letters - all of which failed to rectify the VA's unlawful conduct. Ms. Hasan had even gone so far as to seek assistance from a United States Congresswoman, who despite significant efforts, was also rebuffed by the VA.

1  Following a year of vain attempts to get the VA to honor the bankruptcy discharge order,

2  Ms. Hasan began to believe that not only would she never receive her tax refunds, she feared

3  that despite her bankruptcy, she would never escape from this alleged debt owed to the VA.  Ms.

4  Hasan experienced significant inner turmoil that the VA would simply "establish" new

5  overpayment debts from years past and this would go on forever, leaving her helpless to ever get

6  out from under the VA's alleged claims for overpayments.

7  In mid-December of 2014, Ms. Hasan again experienced severe chest pains and was

8  terrified that she was having a heart attack.  She again went to the Emergency Room to seek

9  immediate treatment.  When the Debtor initially arrived at the Emergency Room, she was

10  immediately tested for a heart attack and that test showed she was not having a heart attack.

11  Following the test that ruled out an impending heart attack, the Debtor was sent to the waiting

12  area to await full treatment and review by a physician at the Emergency Room.  While the

13  Debtor was waiting to be seen at the Emergency Room, she calmed down and her chest pains

14  subsided.  The Debtor then realized that just like the previous incident in August, the chest pains

15  were likely a result of anxiety and stress.  The Debtor's sole source of stress and anxiety during

16  this period was turmoil directly resulting from actions caused by the VA, rendering her unable

17  to pay rent or purchase basic household furniture.

18  The unlawful seizure of Ms. Hasan's tax refunds has caused her substantial harm.  Ms.

19  Hasan is a "permanent temporary" employee of the City of San Diego.  Her status as a

20  permanent temporary employee means that she does not accrue vacation, sick, or holiday pay

21  hours.  This means that when the City is closed during holidays, Ms. Hasan goes unpaid.  In

22  December and January, Ms. Hasan receives significantly less income than normal times of the

23  year, because there are large unpaid holiday periods in December.  Ms. Hasan's plans during

24  this time period were to compensate for this pay-gap with her tax refunds, however due to the

25  VA's actions she was unable to do so.

26  In late 2014 and early 2015, Ms. Hasan's need for her tax refunds was pronounced.  Ms.

27  Hasan had a friend stay with her in December of 2014, and unfortunately, the friend

28  inadvertently brought bed bugs with her and they infested the Debtor's apartment.  Ms. Hasan

1   was forced to incur significant expenses eliminating the bed bug infestation, and was also

2   required to dispose of all her soft furniture and much of her clothing.  Ms. Hasan was forced to

3   dispose of her bed and couch during the bed bug infestation, and has been sleeping on her floor

4   ever since.  Her floors are cold, hard, and uncomfortable and make it very difficult to sleep.  Ms.

5   Hasan hoped she could make up for the shortfall in her wages and pay for the unexpected

6   expense of replacing her furniture by February of this year by using her returned tax refunds.

7   However, due to the VA's actions she has been deprived of her seized tax refunds which are

8   rightfully owed to her, and therefore to date she has been unable to replace her bed or couch and

9   continues to sleep on the floor of her apartment.  Although Ms. Hasan's financial troubles and

10  lack of furniture are not entirely a result of the VA's actions, the VA's seizure of Debtor's tax

11  refunds have greatly exasperated Ms. Hasan's financial struggles.

12          Furthermore, in December of 2014 and January of 2015, Ms. Hasan was unable to pay

13  her rent on time, since she did not have the funds from her tax refunds to help her cover the

14  shortfall created by the unpaid days in December when the City is closed for the holidays.  Ms.

15  Hasan was forced to borrow money from family to assist with paying rent and still had to work

16  out a payment plan with her landlord.  Had Debtor had her tax refunds returned to her, then she

17  would not have had to borrow said money or go late on her rent.  This event caused the Debtor

18  significant stress, anxiety, and embarrassment.  Although not entirely the VA's fault, the VA's

19  unlawful seizure of Debtor's tax refunds has contributed to leaving Ms. Hasan in a state of

20  poverty.  Understandably, the resulting state of her financial affairs has compounded Ms.

21  Hasan's stress-related medical conditions.

22          The VA's unlawful retention of Ms. Hasan's tax refunds has exasperated her financial

23  struggles to the point in which she has been forced to live like a pauper and sleep on the floor of

24  her apartment, further exacerbating Debtor's anxiety by making it difficult to sleep.   Although

25  $4,420.00 is not an enormous amount of money to the Federal Government, this amount is over

26  two (2) month's of Ms. Hasan's net pay; therefore the seizure of her refunds truly affected her

27  financially.  Ms. Hasan has been struggling financially and therefore she desperately needed

28  these refunds to pay for her basic essential living expenses.  The seizure of said refunds has

caused her additional anxiety and embarrassment, because as a result of the VA's actions Ms. Hasan has been unable to have any friends or family come to her home without having to explain why she has no furniture and sleeps on the floor.

In late December of 2014, Ms. Hasan again contacted her attorney's office and described the arduous ordeal she had been through since last speaking with them. Debtor's Counsel and his staff realized that all possible efforts other than an action to find the VA in contempt and request sanctions had been exhausted, and determined it was appropriate to bring this matter before the Court. To date, despite clearly having knowledge of the Debtor's bankruptcy case, and in the face of repeated and lengthy efforts by the Debtor, her Counsel, and even the office of Congresswoman Davis, the VA has stubbornly refused to cease its ongoing violation of the Discharge Injunction and return Ms. Hasan's wrongfully-seized tax refunds.

## III. LEGAL ANALYSIS

### A. JURISDICTION AND VENUE

This Court has subject matter jurisdiction to hear this matter pursuant to 11 U.S.C. §301, 11 U.S.C. §362, 11 U.S.C. §524 and 28 U.S.C. §157(b)(1), (2)(O), respectively. This matter is a core proceeding under 28 U.S.C. §157 and therefore the Bankruptcy Court has jurisdiction to enter a final order. It is a core proceeding because the Debtor is asserting her rights created under 11 U.S.C. §362, 11 U.S.C. § 524 and 11 U.S.C. §105.

The underlying bankruptcy case was filed in the Southern District of California Bankruptcy Court. Therefore Venue lies in this District, pursuant to 28 U.S.C. §1391(b).

### B. THE RESPONDENT WILLFULLY VIOLATED BOTH THE AUTOMATIC STAY AND LATER THE DISCHARGE INJUNCTION PURSUANT TO 11 U.S.C §362 AND 11 U.S.C. §524

In a chapter 7 case, upon filing, 11 U.S.C. §362(a)(6) operates as a stay of, "any act to collect, assess or recovery a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. §362(k) provides that in the event of any willful violation of the

automatic stay, the Debtor is entitled to recovery of, "actual damages, including costs and attorneys' fees, and, in appropriate circumstances … punitive damages." The "willfulness" requirement found in §362(k) requires the Court find, "that: (1) the party knew of the automatic stay; and (2) the party's actions that violated the stay were intentional … it is irrelevant whether the party exhibited bad faith or had a subjective intent to violate the stay" (*In re Granados*, 503 B.R 726 at 733 (9th Cir. BAP, 2013).

Upon the entry of the discharge order, the discharge injunction provided by 11 U.S.C. §524(a) operates as an injunction against "... an act to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived..." 11 U.S.C. 542(a.). A discharge under §727 discharges a debtor from all prepetition debts, except for those listed in 11 U.S.C. §523. *Hessinger & Assocs. v. U.S. Tr. (In re Biggar)*, 110 F.3d 685, 687 (9th Cir. 1997). Section §524(a) may be enforced through the Court's contempt powers under §105(a). *Renwick v. Bennett (In re Bennett)*, 298 F.3d 1059, 1069 (9th Cir. 2002). The party seeking contempt sanctions has the burden of proving, by clear and convincing evidence, that the creditor (1) knew the discharge injunction was applicable and (2) intended the acts that violated the injunction. *ZiLOG, Inc. v. Corning (In re ZiLOG, Inc.)*, 450 F.3d 996, 1007 (9th Cir. 2006) (citing *Bennett*, 298 F.3d at 1069). "More specifically, a creditor must have actual knowledge of the discharge injunction, but need not have any specific intent to violate the injunction, as simply engaging in a volitional act that does in fact violate the injunction is sufficient to trigger sanctions" *Perry v. U.S. Bank Nat'l Ass'n*, 03.2 I.B.C.R. 128, 129-30 (Bankr. D. Idaho 2003) (internal citation omitted); *In re Hawley*, 03.2 I.B.C.R. 108, 111, 2003 Bankr. LEXIS 448, 2003 WL 21105074, at 5 (Bankr. D. Idaho 2003); see also *Knupfer v. Lindblade (In re Dyer)*, 322 F.3d 1178, 1191 (9th Cir. 2003). In the civil contempt context, the focus "is not on the subjective beliefs or intent of the contemptors in complying with the order, but whether in fact their conduct complied with the order at issue," *Hardy by & Through IRS v. United States (In re Hardy),* 97 F.3d 1384, 1390, 1996 U.S. App. LEXIS 27417.

1    Once the debtor makes an adequate showing as to these two elements, the burden shifts to

2    the creditor to demonstrate why it was unable to comply with the discharge

3    injunction. *Perry*, 03.2 I.B.C.R. at 130 (citing *Bennett*, 298 F.3d at 1069).

4    In this case, there is no legitimate dispute that the VA's actions have been willful.  The

5    Debtor properly listed the VA in her bankruptcy petition, and the Court's own certificate of

6    notice shows that the VA received notice by mail at two regional benefit offices, and at their

7    central office headquarters in Washington DC.  After noticing the VA of her bankruptcy case,

8    Debtor's Counsel, Mr. Tiller, had a lengthy phone conversation with a VA representative on

9    March 3, 2014 regarding the Debtor's bankruptcy case.  Mr. Tiller also sent a lengthy e-mail on

10   the same day, wherein he explained, in detail, that the VA's actions were a clear violation of the

11   discharge injunction.  Mr. Tiller included as attachments to the e-mail, copies of the Court-

12   generated Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors, & Deadlines, *and* copies

13   of the Debtor's bankruptcy schedules and forms.

14   Subsequently, on March 18, 2014, when the Debtor spoke to another VA representative,

15   the representative verified that they showed her as "in bankruptcy" in their system and stated that

16   her Counsel's e-mail had been sent to the department within the VA that handles bankruptcy

17   matters.  Debtor's Counsel additionally sent a letter to the VA on or about April 21, 2014, that

18   *again* informed the VA of the Debtor's bankruptcy case, and warned of the VA's unlawful

19   conduct. The VA itself does not dispute that it is fully aware of the Debtor's bankruptcy filing.

20   In their own formal response letter sent to Congresswoman Davis, they readily admit knowledge

21   of the Debtor's bankruptcy case, stating that the Debtor "listed the Department of Veteran

22   Affairs as a creditor to be included within the bankruptcy." The VA letter goes on to state

23   additionally that their records show the Debtor contacting them on March 18, 2014 "regarding

24   the discharged status of her bankruptcy" (See Exhibit H).

25   The VA is not a creditor who took actions without knowledge of the Debtor's bankruptcy

26   case.  Rather, they readily admit knowledge of the bankruptcy case, and instead have stalwartly

27   relied upon their own incorrect interpretation of the law to justify their ongoing, willful, and

28   egregious violation of both the automatic stay, and subsequent discharge injunction.

**C. THE BENEFIT OVERPAYMENT THAT OCCURRED IN 2008 IS NOT A POST-PETITION "DEBT" SIMPLY BY VIRTUE OF THE RESPONDENT "ESTABLISHING" THE OVERPAYMENT POST-PETITION**

11 U.S.C. §101(12) defines "debt" as "liability on a claim.  11 U.S.C. §101(5) defines a "claim" as,

> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

Congress intended the code's definition of "claim" to provide the broadest possible interpretation and the code definition, "contemplates that all legal obligations of the debtor, no matter how remote or contingent, be able to be dealt with in bankruptcy' to permit the 'broadest possible relief in the bankruptcy court." *Lugo v. Paulsen,* 886 F.2d 602 at 608, 1989 U.S. App. LEXIS 14401 citing H.R. Rep. No. 595, 95th Cong. 1st Sess. 309 (1977); S Rep. No. 989, 95th Cong. 2d Sess. 21 (1978).  Courts have long found that Congress intended "claim" to be interpreted as liberally as possible.  *Id.* citing *Kelly v. Robinson,* 479 U.S. 36 at 50, n, 12 93 L. Ed. 2d 216, 107 S. Ct. 353 (1986); *In re Remington Rand Corp.,* 836 F.2d 825 at 829 (3d. Cir. 1988).  In *Behrens v. Woodhaven Asso.,* 87 B.R. 971, (N.D. Ill. 1988), the Court analyzed whether a Homeowner's Association's claim that was assessed post-petition was a pre-petition claim where the events giving rise to the assessment (in that case, the contract underlying the HOA) occurred pre-petition.  The HOA argued that because they did not assess the debt until *after* the case was filed, it was a post-petition claim that survived the Debtor's bankruptcy.  The Court ruled that the debt was a pre-petition claim stating,

> "… these definitions mandate that, absent objection, a debtor be discharged from all prepetition debts, 'no  matter how remote or contingent".  *In re Baldwin-Untied Corp.,* 48 Bankr 901 (Bankr. S.D. Ohio 1985).  The fact that Woodhaven seeks to enforce a liability that was not determined as to amount until a postpetition assessment is made is irrelevant."  *Id.* at 974.

1    The Court went on to state,

2        "The fact that the amount of the debt cannot be determined until after the
         bankruptcy petition is filed in no way precludes it from being included with in the
3        Bankruptcy Code definition of 'debt' and the Debtor's discharge.  *In re A.H.*
         *Robins Company Inc.,* 63 Bankr. 986 (Bankr. E.D. Va 1986); *In re Edge, supra.*
4        Thus the Debtors' obligation under the condominium agreement was a prepetition
         debt regardless of when the amounts were assessed … Any other analysis would
5        effectively gut the careful protections Congress afforded individual debtors
         against unknowing, inadvertent or involuntary reaffirmations."  *Id* at 975.

6

7        Other courts have similarly found that when the event or actions that give rise to the debt

8    occurred pre-petition, the debt is a pre-petition claim, without regard to whether the Creditor

9    assesses the Claim post-petition.  See *Giardina v. Parnell (In re Giardina),* 2004 Bankr. LEXIS

10   2464, 7 (Bankr. E.D. La. Aug 31, 2004), finding that, "if the activity creating a debt occurs

11   prepetition, it would be discharged.  A claim that arises from or is rooted in the pre-petition acts

12   of the debtor, even where those claim are fixed entered by the Court after discharge, are treated

13   as prepetition claims that are discharged."

14       In this case, the VA was properly noticed of the Debtor's bankruptcy case when she filed

15   in April of 2013.  They were again given actual notice in March of 2014 when both the Debtor

16   and her Counsel called in and discussed the issue at length with VA representatives.  The VA

17   admits in their own letters and internal records that they were aware of the bankruptcy case.

18       Upon becoming aware of the bankruptcy case, they took nearly six weeks to refund *only*

19   *a portion* of the total funds unlawfully withheld.  With no explanation, they continued to illegally

20   withhold $4,420.00 of the Debtor's funds until September of 2014, when their own internal

21   process unilaterally determined that in 2008 the VA had overpaid the Debtor by $14,060.00.  The

22   VA then relied on this alleged pre-petition overpayment to justify their continued withholding of

23   the Debtor's tax refunds which were seized in February of 2014.  The VA's contention that their

24   determination of overpayment is the date that their claim was created for purposes of

25   determining dischargeability is blatantly wrong.

26       The overpayment occurred nearly five years prior to the Debtor's bankruptcy case.  The

27   fact that it took the VA over five years to allege that the overpayment occurred does not serve to

28   except it from the Debtor's bankruptcy case.  Furthermore, even the VA's incorrect

interpretation of the law does nothing to explain their conduct in withholding the refunds from March 2014 through September 2014, when they conveniently "discovered" a "new" pre-petition claim to justify their unlawful conduct.

The VA is patently wrong in its interpretation of the law.  Any such assertion that a creditor's determination of a pre-petition debt changes the date the claim arose for bankruptcy purposes has no basis in the code, or case law, and would run afoul of the clear intentions of Congress.  The VA has relied on erroneous interpretations of the law to partially justify its egregious and willful violation of the automatic stay, and later the discharge injunction.

## D. THE RESPONDENT'S ACTIONS WERE NOT "RECOUPMENT" AND ARE NOT EXEMPT FROM THE AUTOMATIC STAY OR DISCHARGE INJUNCTION

The doctrine of recoupment allows a party to deny future payments due under a singular transaction, as a means for mitigating loss.  Recoupment is a long-standing creditor's right which is not a collection action barred by the automatic stay.  *United Structures of Amer. V. G.R.G. Eng'g*, 9 F.3d 996 at 999 (1st Cir. 1993).  To the extent a debtor's claim is subject to a recoupment, the debtor has no interest in the future payments that would otherwise be owed to the debtor as a result of the Creditor's recoupment claim.  *Flagstaff Realty Asoocss.,* 60 F.3d 1031 (3rd Cir. 1995).  Recoupment, however, would only apply if the actions of the VA were to withhold a benefit owed to the Debtor under the same transaction.  *In re University Medical Ctr.,* 973 F.2d 1065 (3rd Cir. 1992).

If the VA were simply withholding *future benefit payments*, then Recoupment or offset could be claimed as possibly supporting their failure to pay future payments, and would arguably not be a violation of the automatic stay or discharge injunction.  In this case, however, the VA has instead actively pursued collection actions against other assets of the Debtor.  The VA unlawfully seized the Debtor's tax refunds, which are completely unrelated to future benefits, and are certainly not part of the same transaction for which they base their Claim.  Moreover, the VA has stated in their own collection letters that they intend to report the pre-petition obligation

1    to the Debtor's credit report, to assign the Debt to private debt collectors, and pursue

2    garnishment of the Debtor's wages.  None of those actions could remotely be explained as

3    "recoupment" or a "setoff."

4        Furthermore, even if the VA thought it could justify any of its actions as somehow being

5    protected as Recoupment, most courts have found that Recoupment is not applicable to future

6    government benefit payments such as Social Security Benefits or VA benefits.  *Lee v. Schweiker,*

7    739 F.2d 870 (3rd Cir. 1984); *In re Rowan,* 15 B.R. 834 (Bankr. N.D. Ohio 1981), aff'd 747 F.2d

8    1052 (6th Cir. 1984); *In re Howell,* 4 B.R. 102 (M.D. Tenn, 1980).

9

10    ### IV. CIVIL CONTEMPT REMEDIES:

11        A bankruptcy court may award damages for a violation of the discharge injunction under

12    the Court's contempt power.  *State Bd. of Equalization v. Taxel,* 98 F.3d 1147, at 1152 (9th Cir.

13    1996).  11 U.S.C §105 authorizes the Court to issue "any order that is necessary or appropriate to

14    carry out the provisions of this title."  Damages are a long-recognized sanction for contempt.

15    The purpose of sanctions is to compensate the opposing party for the injuries which arise from

16    the contempt.  *Computer Communications Inc. V. Codex Corp.,* 824 F.2d 725 at 731 (9th Cir.

17    1987); *Crystal Palace Gambling Hall Inc. V. Mark Twain Industries, Inc.* 817 F.2d 1361 at 1366

18    (9th Cir. 1987).

19        Actual damages are broadly construed to embrace consequential damages and include

20    attorneys' fees incurred in the civil contempt action.  *In re Zartun,* 30 B.R. 543 at 546 (B.A.P.

21    9th Cir. 1983).  The contempt need not be willful and there is no good faith exception to

22    violations of the discharge order.  *Crystal Palace,* 817 F.2d at 1365; *Petersen v. Highland Music,*

23    *Inc.,* 140 F.3d 1313 at 1323 (9th Cir. 1998).  Punitive damages may also be imposed for a willful

24    violation of 11 U.S.C. §524.  The test for willfulness under §524 is the same as that for willful

25    violation of the automatic stay under 11 U.S.C. §362.  *In re Novak,* 223 B.R. 363 at 366-367

26    (Bankr. M.D. Fla. 1997).  In the 9th circuit, a "willful violation" does not require a specific intent

27    to violate the automatic stay. *Havelock v. Taxel,* 67 F.3d 187 at 191 (9th Cir. 1995).  Rather, the

28    statute provides for damages upon a finding that the defendant knew of the automatic stay and

that the defendant's actions which violated the stay were intentional. *Id*.  Whether the party

believes in good faith that it has the right to [take the action it did] is not relevant to whether the

act was 'willful' or whether compensation must be awarded.  *Id*.

In this case, there is no real dispute that the VA's conduct is of a type that Congress

intended to be subject to civil contempt remedies.  The VA readily admits knowledge of the

Debtor's bankruptcy case.  The VA has been repeatedly warned by phone, e-mail, and written

letters by Debtor's Counsel, that their conduct is unlawful and subject to contempt and sanctions.

The VA even received a written letter from Congresswoman Davis similarly asserting that they

should return the seized refund.  Rather than simply doing what the law requires of them, the VA

instead stubbornly insisted on continuing their appalling conduct.  The VA has staunchly

entrenched itself in an obviously incorrect interpretation of the law and in doing so has

significantly harmed the Debtor and forced her Attorney to take considerable action to attempt to

force them to comply with the law, thus Debtor should be compensated.

### V. DAMAGES:

Pursuant to 11 U.S.C. §362(h), an individual harmed by a willful automatic stay violation

is entitled to collect compensatory damages, attorney's fees, and punitive damages.  *Knupfer v.*

*Lindblader (In re Dyer)*, 322 F.3d 1178 at 1189, (9th Cir. Cal. 2008).   Punitive damages are

appropriate where an offending party's conduct is intentional, egregious, wanton, or oppressive.

*Herbert v. United States (In re Herbert)*, 81 A.F.T.R.2d (RIA) 2105 (B.A.P. 9th Cir. 1998).

Punitive damages may be appropriate where the offending party shows indifference to the

automatic stay and are needed to deter future stay violations.  *In re Neal*, 106 B.R. 90, (Bankr.

E.D.N.C. 1989).

In this case, the Debtor has suffered the following in damages:

1.   Actual damages in the amount of $4,420.00.00 for funds still being wrongfully

withheld by the VA.  These funds are tax refunds owed to the Debtor which should

never have been seized.  The VA has deprived the Debtor of these funds since

February of 2014 despite repeated attempts by the Debtor and her Counsel to have the VA turnover the funds.

2. Actual damages of $5,000.00 in the form of stress, anxiety, fear, sleeplessness, and depression caused as a direct result of the VA's actions. By withholding the Debtor's funds the VA caused the Debtor to be unable to pay her rent on time on two separate occasions. The VA also caused the Debtor to be unable to replace her mattress and other soft furniture, and as a result the Debtor has had to sleep on the floor of her apartment since December of 2014. The VA's actions caused the Debtor embarrassment as she could no longer bring friends and family to her home without having them realize she has to sleep on the floor. The VA's wanton conduct in light of the repeated formal requests by the Debtor, her Counsel, and Congresswoman Davis, made the Debtor lose all hope that she would ever be able to have the fresh start promised her by the bankruptcy code. The VA caused the Debtor true despair and depression. The anxiety, stress, and sleeplessness created by the VA gave the Debtor chest pain on two separate occasions that caused her to seek emergency medical treatment. The physicians who treated her explained that her chest pain was a result of anxiety, stress, and sleeplessness exacerbating her existing heart disease. See *Declaration of Debtor In Support of Motion* attached hereto and incorporated by this reference.

3. The Debtor has spent a year going back and forth with the VA directly, with her bankruptcy attorney, and later with Congresswoman Davis' office. The Debtor has called the VA on multiple occasions, with each call requiring nearly an hour of hold time. The Debtor has had to provide the VA and Congresswoman Davis' office with copies of her bankruptcy paperwork. The Debtor had to follow up with her bankruptcy attorney both by email and phone on numerous occasions. The Debtor had to document the VA's collection efforts for her attorney. At a low estimate, the Debtor has spent more than 100 hours in the last year attempting to resolve this matter. The Debtor earns approximately $17 per hour, resulting in at least $1,700.00

in actual lost time attempting to resolve this matter.  See *Declaration of Debtor In Support of Motion.*

4. Debtor's Counsel has had to spend considerable time attempting to rectify the VA's unlawful conduct.  Counsel for the Debtor has been forced to make multiple telephone calls to the VA requiring nearly an hour of hold time for each call. Debtor's Attorney has been forced to write letters and send multiple e-mails, meet with the Debtor, and attempt to force the VA to comply with the Discharge Order for over a year.  The VA's staunch position refusing to comply with the Discharge Order despite multiple attempts by Debtor's Counsel to informally get them to comply has forced counsel to thoroughly piece together the facts of this situation, research the applicable law, and draft this lengthy motion in order to force the VA to comply with this Court's Order.  Therefore, Debtor has incurred to date actual attorney's fees and costs in the amount $30,980.00 to resolve this matter. A true and correct record of fees earned by Debtor's Counsel is attached hereto as Exhibit J and incorporated by this reference.

5. The VA's conduct warrants punitive damages of $25,000.00 in the form of a coercive fine.  The VA's conduct in this case has been particularly egregious and shocking. The VA does not dispute knowledge of the bankruptcy case.  Debtor's Counsel has repeatedly provided explicit warnings and instructions to the VA regarding their unlawful conduct and the potential consequences for their failure to abide by this Court's orders.  The Debtor even had a member of Congress attempt to convince the VA to comply with the law.  After all of those attempts to resolve this matter informally, the response from the VA was a letter rebuffing all attempts at compliance with the law, and instead taking a defiant stance and insisting that their pre-petition obligation is still owed and reaffirming their intention to continue to collect on it.   The Debtor's funds have been unlawfully held for nearly a year and the VA continues to actively collect on a pre-petition claim.  The VA's conduct has not been a mistake, or the action of a low-level representative.  The VA's formal letter to

Congresswoman Davis made clear the offending and unlawful conduct is a policy of the Department of Veterans Administration, and an intentional choice made by high-level officials within the Department.  The VA's wanton conduct alone clearly supports an award of punitive damages, but a punitive award is also necessary to cause institutional change within the VA and deter future similar conduct.

## VI. CONCLUSION

WHEREFORE, for the reasons stated above the Debtor respectfully requests this Court enter an order for the following:

A.  Compensatory damages in the form of sanctions pursuant to 11 U.S.C. §362, §105, and 11 U.S.C. §524, respectively, sufficient to compensate the Debtors for damages including but not limited to:

    1.  Compensation of $4,420.00 in actual damages for the amount of the Debtor's tax refunds still wrongfully withheld as of the date of this motion.

    2.  Compensation of $5,000.00 in actual damages for the anxiety, stress, and fear, and two ER visits attributed to stress and anxiety suffered by the Debtor because of VA's relentless and unlawful refusal turn over the unlawfully withheld funds.

    3.  Compensation of $1,700.00 in actual damages for the Debtor's lost time and costs spent trying to resolve the VA's ongoing violation of the automatic stay and later, the discharge injunction.

    4.  Compensation for attorney's fees and costs of $30,980.00.

    5.  Punitive damages in the form of a "coercive fine" of $25,000.00 for VA's willful, reckless, and egregious conduct.

B.  Such other and further relief as the Court may deem just and proper.

Dated: March 19, 2015

/s/ Ahren A. Tiller
Ahren A. Tiller
Bankruptcy Law Center, APC
Attorney for Debtor